Dorothy W. Sammons v. Commissioner. Wheeler Sammons v. Commissioner.
Dorothy W. Sammons v. Commissioner
Docket Nos. 13068, 13069.
United States Tax Court
1948 Tax Ct. Memo LEXIS 20; 7 T.C.M. (CCH) 923; T.C.M. (RIA) 48261; December 8, 1948
*20 L. M. McBride, Esq., 310 So. Michigan Ave., Chicago, Ill., for the petitioner. Jackson L. Boughner, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: These proceedings are consolidated for hearing and involve deficiencies in income taxes for 1943 in the amount of $3,500.28 in Docket No. 13068, and $1,001.96 in Docket No. 13069. The issue is whether in determining the distributive share of each petitioner in the net income of a partnership, there should be allowed as a deduction, some part of the alleged cost of biographical sketches published in a reference book entitled "Who Was Who in America." The facts set forth in a stipulation are found as stipulated and, to the extent regarded as material to proper consideration of the issue, will be incorporated in findings of fact made also from other evidence. Findings of Fact The petitioners are husband and wife and reside in Chicago, Illinois. Their returns for the taxable year were filed with the collector for the first district of Illinois. The first volume of "Who's Who in America," a book containing biographical sketches of living Americans, was published in 1899 by A. N. *21 Marquis, under the name of A. N. Marquis & Co. Biennial volumes were published thereafter, volume 14 having been ready for publication about January 1, 1926. At that time, A. N. Marquis & Co. was publishing other books, including "Who's Who in Chicago." On January 2, 1926, petitioner Wheeler Sammons, hereinafter sometimes referred to as the petitioner, and Arch W. Shaw, purchased from A. N. Marquis for $150,000 all of the publisher's "publications, business and other assets, - including the good will of the business," all publishing rights pertaining to "Who's Who in America," "Who's Who in Chicago," and "Who's Who in New England," all trademarks, patents, copyrights and trade names, [except the books on hand for the 1926 edition of "Who's Who in Chicago," and "The Abridged Compendium of American Genealogy" including all copies thereof, cuts, etc., pertaining thereto], and the exclusive right to use the name A. N. Marquis and A. N. Marquis & Co. in connection with "Who's Who in America" and allied publications. The agreement of sale provided, among other things, that the purchasers had satisfied themselves that the sales of "Who's Who in America" (1924-25 editions) were about 23,000 *22 copies and that net profits of A. N. Marquis & Co. were at least $20,000 per annum, all as represented by the seller; that examination had been made as to legal protection of the name, and that the name was properly protected; that the purchasers would organize a corporation under the name of "The A. N. Marquis Company," with a capital stock of $150,000. and transfer to such corporation all of the property acquired from the seller; that the seller would subscribe and pay for $30,000 par value of the corporation's stock; that so long as the purchasers desired, A. N. Marquis would act as nominal editor of such publications as were selected by the purchasers, devoting such time to the activities as he desired to give, at a "salary or nominal honorarium" of $3,900 per annum, the amount he had set aside for himself for salary in his own business, and that so long as A. N. Marquis was a stockholder of the corporation no salaries would be paid by the corporation other than the salaries then being paid by the seller, and that no salary, except to A. N. Marquis, should be paid in excess of $3,000 per annum, without agreement of the seller and buyers, and that Marquis would not publish for ten *23 years anything like "Who's Who in America" or other publications involved. The purchasers received in the transaction 49,210 biographical sketches, of which 26,915 appeared in the then current volume of "Who's Who in America," volume 14; 12,033 were of deceased individuals and the remainder, 10,262, were of persons whose listings had been discontinued for reasons other than death. Pursuant to the agreement of January 2, 1926, in April 1926 the buyers formed a corporation under the name of The A. N. Marquis Company, with a capital stock consisting of 1,500 shares of common stock, par value $100 each, of which petitioner Dorothy W. Sammons and A. W. Shaw each purchased 600 shares and A. N. Marquis 300 shares. In 1928, Dorothy W. Sammons purchased the 600 shares owned by A. W. Shaw, and on January 21, 1936, petitioner purchased the 300 shares held by A. N. Marquis. The corporation continued the publication of "Who's Who in America." On October 1, 1936, the petitioners formed a partnership under the name of "The A. N. Marquis Company," to which they transferred the stock of The A. N. Marquis Co. for partnership interests of 20 per centum in favor of petitioner and 80 per centum in *24 favor of his wife. On December 21, 1936, the partnership, as sole corporate stock-holder requested distribution in liquidation of the business, good will, trade names, trade-marks, copyrights and publishing rights of all kinds. Between December 22, 1936, and March 1937, all of the assets of the corporation, including good will, trademarks, trade names, copyrights and publishing rights were distributed to the partnership in complete liquidation of the corporation. Included among the assets distributed, amounting to $196.869.87 was the amount of $95,000, which amount is referred to in the stipulation as "publishing rights, copyrights, etc." The item of $95,000 was entered in the books of the partnership as "Goodwill, trade-marks, trade names, copyrights and publishing rights" and appeared in that amount annually thereafter until the publication of "Who Was Who in America." Other assets received included 65,878 sketches, of which 31,434 appeared in volume 19 of "Who's Who in America," published in 1936; 19,836 were of deceased individuals and 14,608 were of persons whose listings had been discontinued for other reasons. Except for eliminations on account of death and other reasons, *25 sketches of the 31,434 individuals, together with new sketches, appeared in volumes 20 and 21 of "Who's Who in America," published in 1938 and 1940, respectively. The closing entries of the corporation and the opening entries on the books of the partnership disclose no assets of an intangible nature other than the item of $95,000 (except certain accounts receivable, prepaid insurance and similar current operating items). Of the 34 copyrights transferred by the corporation to the partnership, 19 were for "Who's Who in America," four for "The Book of Chicagoans," one for "Woman's Who's Who in America," two for "The Book of Detroiters," two for "The Book of St. Louisians," one for "The Book of Minnesotans," two for "Who's Who in New England," one for "The Men of Buffalo" and two for "Who's Who in Chicago and Vicinity." The partnership continued the publication of "Who's Who in America." In 1942 it published "Who Was Who in America." At the time the business of A. N. Marquis was purchased, the petitioner, who negotiated the transaction. intended ultimately to publish the book. The sales of "Who's Who in America" and other publications published by the partnership, except "Who Was *26 Who in America," from 1927 to 1945, inclusive, were as follows: "Who's Who in America"
$1,116.699.70
"Who's Who in Commerce & In-
dustry"
83,748.22
"Who's Who in Chicago & Illinois"
49,934.67
"Who's Who in Pennsylvania"
25,114.89
"Who's Who in New England"
24,474.85
"Who's Who in Latin America"
1,828.00
Monthly Supplement to "Who's
Who"
41,852.43
Directory of Medical Specialists
39,456.35
Miscellaneous Old Editions
387.10
Total
$1,383.496.21
The book "Who Was Who in America" published in 1942 was a compilation of the biographical sketches of all deceased Americans, except those whose deaths could not be confirmed, who had appeared in any volume of "Who's Who in America" through volume 21, published in 1940, and who had died prior to 1942. The volume contained 27,458 biographical sketches, as follows: Discontinued account death prior to 1938
19,836
Discontinued account other than death
and who died prior to 1942
4,238
Discontinued account death between
"1936" and 1942
3,384 In addition thereto the volume listed, without sketches, the names of about 12,075 individuals whose sketches had been discontinued prior to or in 1940 *27 for reasons other than death where no report of death had been received. In the event the death of such individuals is confirmed, their biographical sketches will be included in the next edition of "Who Was Who in America" with a statement that they should have been published in the previous volume. Sketches appearing in the latest edition of "Who's Who in America" were submitted to the persons involved for revision before being published in the next edition. Sketches of persons in "Who Was Who in America" were identical with the sketches appearing in "Who's Who in America," with the date of death added, if known. Sketches were not maintained in the form of plates for reprinting. About 10 per cent of the sketches of persons who died after 1936 were revised for a subsequent edition of "Who's Who in America," before being printed in "Who Was Who in America." The balance sheet of the corporation as of September 30, 1936, contained an item of $150,000 for "Publishing rights, copyrights, etc." The audit statement of the corporation as of December 31, 1936, showed "Good Will, copyrights and Publication Rights" as being $95,000 before the liquidation and "none" after liquidation. A note *28 to the statement recited that the item of $95,000 was the difference between the $150,000 paid for the assets and good will of A. N. Marquis & Co. in 1926, and the valuation of $55,000 placed upon the tangible assets acquired at that time. The $55,000 was charged to surplus as an "adjustment for overstatement of good will as of May 1, 1926." The petitioner had general charge of the business of the corporation and partnership, including editorial policies. During the period 1926 to 1936, the corporation would have had to pay salaries aggregating $25,000 per annum if it had engaged two outside individuals to have charge of its editorial policies and the general management of its affairs. The book "Who Was Who in America" was published primarily as an aid in the sale of "Who's Who in America." A current copy of "Who's Who in America" and "Who Was Who in America" included all of the material contained in previous volumes. The two volumes were offered to buyers at the combination price of $18. If "Who Was Who in America" had been offered separately, it would have been priced at about $10.50 per copy, instead of $7.35, the price used in the combination. Sales of the publication were *29 made in each of the years 1942 to 1945, inclusive, at a total gross profit for the entire four years of $33,470.49, without any charge for overhead. Overhead chargeable to the publication on the straight percentage basis of sales of all publications, was $16,923.78. "Who's Who in America" was compiled by first selecting names meeting certain standards and then sending questionnaires to the individuals for completion. Upon receipt of the questionnaires, sketches were prepared and submitted for approval or correction before being published. The same procedure was followed with each issue of the book. Lists used by the partnership for soliciting orders were obtainable by any individual desiring to use them. Sketches appearing in sectional books were obtained from "Who's Who in America" but were not used until they had been submitted to the individuals for revision for local reference and current data. A majority of the individuals made some changes. The corporation had no registered trademarks. During the years 1926 to 1936, both inclusive, petitioner, A. N. Marquis and Elmer F. Weck were the only active officers of the corporation. Petitioner was paid a salary of $5,000 in *30 each of the years 1927 and 1928 and no salary in the other years. Marquis was paid a salary of $3,900 in 1926, $5,634.19 in 1927, $5,150 in 1928 and $3,900 each year thereafter. Weck was paid a salary of $3,080 in 1926, $3,530 in 1927, $3,790 in 1928, 1929 and 1930, and $4,050 each year thereafter. No deductions were claimed by the corporation or the partnership with respect to any part of the item of $150,000 or $95,000 until 1944, when retroactive adjustments were made on the books of the partnership for 1942 and 1943. No deductions regarding the issues herein were taken on the tax returns for 1942 or 1943. In the petitions error by the Commissioner is based upon the allegation that petitioners were not allowed benefit of cost of publication of "Who Was Who in America." Opinion The issue grows out of the accounting item of $95,000 entered in the books of the partnership in 1936 as an asset, consisting of good will, trade-marks, trade names, copyrights, and publishing rights, which was received in liquidation of the corporation. Nothing was deducted by the partnership in computing its net profits and no deduction was claimed in returns or allowed by the respondent in determining *31 petitioners' distributive shares of the profits of the firm. Petitioners contend on brief that the amount represents the value of 19,836 sketches of deceased persons and 14,608 sketches discontinued for other reasons which were acquired in the dissolution of the corporation in 1936 and 1937, and, therefore, does not represent intangibles as shown by the records. Under such contention petitioners insist that as some of the sketches were used in the publication of "Who Was Who in America" in 1942 and will not be used again, some part of the value, prorated over the years 1942 to 1945, inclusive, on the basis of net sales of the book, is deductible as a cost of publishing the volume. Methods with different results are suggested for determining the basic amount. The position of respondent, upon brief, is that the amount represents good will. To agree with the petitioners would be contrary to the language of the sales agreement in 1926, and to the views taken by the corporation, during its existence for ten years, and thereafter by the partnership until 1944. Persuasive evidence is necessary to overcome such current construction by the parties primarily interested in the subject. Jones *32 on Evidence, 2nd Ed. p. 2852. The treatment of the amount on the books and records of the corporation and partnership as representing intangibles is shown in detail in our findings of fact. It is particularly significant in view of the consideration given the book entry as to good will during the course of liquidation of the corporation and the delivery of its assets to the partnership. At that time the only adjustment made to the account was to charge off $55,000 against surplus as "an adjustment for overstatement of goodwill value as of May 1, 1926," thus recognizing that there was, and had been since 1926, valuable good will and other intangibles in the business. To overcome the effect of the book entry, which continued until 1944, when it was adjusted in some manner not shown by the evidence, and to show that in 1926 and 1936 the business had no good will or intangibles of value, petitioners refer us to testimony of petitioner, who negotiated the purchase from Marquis in 1926. His testimony is merely that in 1926 and 1936 he ascribed no particular value to the name of the publisher upon the ground that in the operation of a publishing business of the type acquired, the name *33 of the publisher is not a determining factor. Opposed to such testimony of an interested party we find express provisions in the sales contract of January 2, 1926, that the assets to be transferred included "the good will of the business," that A. N. Marquis would not compete, for the organization of a corporation under the name of "The A. N. Marquis Company" to acquire the assets from the purchasers, and giving the buyer the exclusive right to use the name A. N. Marquis and A. N. Marquis & Co., the latter being the trade name used by Marquis in the publication of "Who's Who in America" and other allied publications. The name in its significant parts was used by the corporation and partnership. The agreement of sale in 1926 specifically provided for "legal protection" of the name and that A. N. Marquis should not compete for ten years. The representations as to sales of "Who's Who" being 23,000 copies, and net profits of at least $20,000, and the argeement that Marquis would remain as nominal editor, can not be overlooked. In 1936, the partnership as sole stockholder requested, and secured, liquidation distribution of business, good will, trade names, trade-marks, copyrights and publishing *34 rights. The sketches in question were not at any time entered in the books as capital assets, or until 1944 treated as such. In addition, it does not appear that sketches of individuals who died after 1936 were entered in the books at any cost figure. All these provisions clearly show that good will, copyrights and trade names were regarded as highly important elements in the sale, and in distribution to the partnership. Interested testimony now fails to convince us otherwise, or to show that the $95,000 item was not as shown by the records made over a period of years. We can not minimize these records as does petitioner's present view. Concerning lack of any value for the 34 copyrights acquired with other rights, for the $95,000 as the records indicate, petitioners argue merely that with the publication of a new edition of "Who's Who in America" the copyright on the preceding volume ceased to have any value. It is apparent that the copyrights for "Who's Who in America" had more value to the partnership than to prevent the copying of current issues of the book. They at least protected he publisher in sales of old volumes of the book and nothing here is opposed to the idea that sales *35 of such publications were made, particularly before the issuance of "Who Was Who in America", and otherwise gave the holder rights in the printed sketches published therein. Furthermre, no evidence was offered that there was no value in the purchased copyrights for the publications other than "Who's Who", and of course covered, in the record, by the $95,000. The records, above referred to, indicate that the $95,000 was, among other things, for 65,878 sketches acquired from the corporation. Of these 31,434 were used in compiling the volume 19 of "Who's Who in America" in 1936, and except for eliminations on account of death and other reasons, were used in publishing volumes 20 and 21 in 1938 and 1940, respectively. It is obvious that these sketches, most of which were embodied in copyrighted books previously issued, had value, even though it was necessary to re-edit them to bring them up-to-date for current use. Petitioner testified that the $95,000 includes the "cost" of the 31,434 sketches. Such testimony is directly contrary to the view urged by him upon brief. The sketches of deceased individuals and other discontinued sketches were not used for any purpose prior to being included *36 in "Who Was Who in America", published in 1942. When published, the book was offered with, and as an inducement to buy, "Who's Who in America" in a combination price. These facts are not consistent with the petitioner's idea of their value when acquired. Petitioner testified that the sketches had a value of about $60,000 in 1936, based upon profit obtainable when published in a book. But he also testified that they were worth about the same amount in 1926, that a buyer would not have paid $60,000 in 1936 to obtain a gross profit of $33,000 in "1942", and that a buyer would not have had to sell the book as a combination with another volume. Gross profit on sales of "Who Was Who in America" through 1942-45 was $33,470.49, without charging any overhead expenses, which on the basis of gross sales of all publications would have amounted to about $17,000. Obviously the valuation is a mere guess. We are unable to accept the testimony as proof of value in any amount. Further discussion of the prime question in the petitioner's contention does not appear necessary. We are unable to find from the evidence that, as contended by the petitioners, the amount in question represents the cost of *37 the sketches of deceased individuals and others whose sketches had been discontinued for other reasons. Under the original contract only $55,000 was paid for tangibles, on sale of a business represented to be producing $20,000 a year and selling 23,000 copies of "Who's Who in America". The value of good will, carefully transferred, was not shown to be less than the $95,000. The item can not instead, even in part, be reasonably ascribed to some intention to publish, ultimately, "Who Was Who", which when published 16 years later produced in four years a total net of about $17,000, even when combined with "Who's Who in America" in order to sell the latter. If we were able to agree with the petitioners on the point just disposed of, we would lack a reasonable basis for determining an amount deductible in the taxable year. We are asked to prorate the whole amount over the period 1942 to 1945, inclusive, on the basis of net sales of "Who Was Who in America". Sales were made in such years, but nothing is contrary to the view that copies were sold in subsequent years, or, if the edition was sold out, reprints will not be made, or that the copyrighted material will not be used in subsequent *38 editions or volumes. Under all of the evidence we find it neither practicable nor possible to apply the principles of , as urged by the petitioner, and allocate some portion of the $95,000 to any cost of the sketches. The amount under the facts is fully explained as covering good will and other factors recited in the records made. No part of the amount can reasonably be allocated to cost in 1942 of "Who Was Who". Accordingly, Decision will be entered for the respondent.